## Case No. 7,172.

JAFFRAY et al. v. MURPHY.

[19 Int. Rev. Rec. 143.]

Circuit Court, S. D. New York. 1874.

Isaac Phillips and Stanley & Clark, for plaintiffs.

H. E. Tremain, for defendant.

WOODRUFF, Circuit Judge (charging jury). I shall not deem it my duty in this case to enter very largely into the discussion of the testimony, but hope to be able to present to you the rules of law applicable to the case in a form which will be intelligible to you. I shall go so far by way of illustration, and refer to some testimony, perhaps, as may be sufficient to enable you to apply those rules to the particular case in question. The plaintiffs here paid to the United States, upon the specific goods which are in controversy, a duty of sixty per cent. ad valorem. They claim that thirty per cent. only should have been exacted. No question is made here now that they protested against the exaction in due season, and complied with all the preliminary steps which are prescribed by the statute to entitle them to come into this court and assert their claim to a reimbursement; and they are, therefore, in a situation to claim reimbursement, and to have your verdict for the amount it legally exacted, if such exaction be upon the evidence as you shall find it an illegal one. The defendant comes in answer to this claim to justify the exaction of the duty of sixty per cent; and upon the defendant is the burthen of justifying that exaction by proving, to your satisfaction, facts which, according to the law as it shall be expounded to you by the court, entitled him to require sixty in place of thirty per cent. And for that purpose the defendant refers to the statute, to the terms of which I will call your attention. It is founded in the eighth section of the act of June 30, 1864 [13 Stat. 210], in these words: "On and after the day and year previously mentioned in the act, in lieu of the duties heretofore imposed by law on the articles hereinafter mentioned, there shall be levied, collected, and paid on the goods, wares, and merchandise enumerated and provided for in this section imported from foreign countries the following duties and rates of duty; that is to say, on all silk vestings, pongees, shawls, scarfs, mantillas, pelerines, handkerchiefs, veils, laces, shirts, drawers, bonnets," and other articles which I need not dwell upon, sixty per cent. ad valorem. "Silk laces" are the important words in question in this case.

Now, gentlemen, that statute, and those words of that statute, are in form general on "silk laces." Its words are apt to include all laces made of silk. Its language is intelligible; it is comprehensive; it is a part of a statute which contains classifications of goods according to the material of which they are made. The statute is not exclusively occupied in classifying by material, but many of its clauses classify the subject of duty by the material of which it is made; and this section does not purport to specify or particularize the kinds of laces made of silk which it defines. It is "on silk laces," without discrimination, without pointing at all to the name by which they are known in commerce, and without specifying at all any of the different kinds of laces made of silk of which the witnesses have spoken; and it is my duty to say to you, gentlemen, that the mere fact that silk laces are divided into kinds, which in trade and commerce are designated by descriptive names which are known as designating different kinds of silk laces, is not enough to take any goods out of these comprehensive terms. Nor does the fact (if it be proved) that some laces made of silk are made by machinery, and some laces made of silk are made by hand, of itself withdraw any of them from the general designation of silk laces which is employed in this section of the statute.

The tariff acts generally, as I have said of this particular act, employ two modes of designating the subjects of duty; perhaps more, but two in particular which are pertinent to the discussion which has been had before you, and which may be important, perhaps, when you come to apply what I have to say to you to the evidence, and to the consideration of this case. One is, as I have suggested, the classification with reference to the material of which the goods are made, and another is by specific technical names given to specific articles. Now, gentlemen, when the goods which are subjects of duty are designated by the material of which they are made or composed, the statute is to be construed as presumptively including such goods by whatever subordinate or specific name they may be known; and though all in the commercial world are in the habit of using the specific name when they speak of the particular article in question. For example, to illustrate: If we have a tariff act which imposes a particular duty on cotton goods, if that designation alone is used in the legislation pertaining to the subject of duty upon the importations, it presumptively includes all cotton goods, even though importers, merchants, dealers, and customers all the country through, when they speak of a particular kind of goods made of cotton, always give the special name of the article; as, for example, under this attempted illustration, muslin, cambric muslin, cotton drilling, cotton shirting, cotton sheeting. Doubtless the list might be largely increased, providing that customers wanting cambric muslin never go into a store and ask for cotton goods, or providing that importers importing cambric muslin never advertise or speak of it among themselves or import it, or deal in it with customers, under the name of cotton goods, but deal in it and speak of it as cam-

bric muslin, or that parties who deal in or are in the habit of selling or using cotton drilling use that as the appropriate commercial name, would not tend to withdraw those goods—would not withdraw those goods from the general designation in a statute wherein a duty was imposed upon cotton goods, they being made of cotton, which I have assumed for the purposes of my illustration. In such cases, gentlemen, the terms of the statute include all the subordinate or special kinds of cotton goods, notwithstanding that dealers and others—men in trade and commerce—when they speak of the goods they want, or the goods they offer for sale, or the goods they wish to buy, describe them by the specific name of the article which they wish to buy, sell, advertise, or import.

A similar illustration might be supposed in regard to silk goods. These suggestions are hypothetical, and are only given to you that you may understand the view which the court takes of the law. I say a similar illustration might be supposed in regard to silk goods and their various subordinate names; for instance, suppose there is a duty on silk goods, and nothing else in a statute or prior legislation to limit or control the signification, then, as I have before said, the term would indicate all goods made of silk. Possibly, also, it might include some goods that contained part cotton, if such were in use and were made, imported, and known in trade and commerce as silk laces. But leaving that point out of view, as it is not material here, it is sufficient to say that it would include all goods made of silk. Now, I say, the fact that customers and dealers, importers, traders, and commercial men at large, or the whole world, were in the habit of asking for taffeta when they wanted taffeta, or advertising taffetas if they had taffetas for sale, and that taffetas were therefore known as descriptive of the particular article among commercial men throughout the country—or lute-strings or any of those terms which are descriptive subordinate designations of a kind of silk goods. I say that evidence that the importer had introduced them into the market and entered them by their specific name would not withdraw them from the general designation of silk goods. So here in the application of this statute to the case which is now before you, in the absence of any other consideration than the terms of the statute, the word silk laces embrace all laces made of silk; and to take any kind of silk laces out of the classification imposing a duty of sixty per cent., it is not enough that the plaintiffs show that some laces made of silk are commonly known as blonde laces, or that some laces made of silk are commonly known (and no matter how extensively or among what class) as Brussels lace, or that some are commonly known as thread laces, guipure laces, etc., I say it is not enough; and I have been thus precise and particular in order that you may not be misled by the idea that where general terms are used in the statute, they do not embrace the particulars. They do embrace the particulars, if there be nothing else to throw light upon the subject, and to restrain their meaning or withdraw particular articles from it. I therefore say again, it is not enough that the witnesses, merchants, or others say that, in trade and commerce, a thing included in the general designation is commonly or universally spoken of by its specific, particular name, in order to designate a particular kind of silk laces which the customer has in view, or which the merchant desires to buy or import.

Now, gentlemen, starting with these general propositions, which I desire to make entirely specific, and hope to make intelligible, I come to inquire what then is the precise question in this case. It is claimed here that in trade and commerce a discriminative term has been long used to designate the particular goods now in question, which has been adopted by congress even, and which has operated to withdraw the goods now in question from the general description, and has assigned them to a distinct class or subject of duty. Now such a result might be wrought out by a universal practice among merchants and dealers, men conversant with the articles in question, of discriminating between silk laces and the goods in question; and if that has come to be the universal acceptation of the term appropriately describing these goods, so as to give to the term "silk laces" a technical meaning instead of a general meaning as I have just defined it, and as it is on its face, then the particular name would prevail in the statute, and this would be specially true if we found that congress itself had adopted the designation into its legislation.

Now in support of the claim that these goods now in question have been withdrawn from the general designation, "silk laces," and have acquired a specific name, counsel referred to the fact that in the statute of 1861 [12 Stat. 178], there were two clauses, one of which corresponds substantially with the act under which this duty was exacted, and which employs the term "silk laces" and another clause which is not found in the act now in question, and which speaks of thread laces as a distinct and specific thing, indicating that in the eye of the legislators there was a distinction arising from the usage of trade, and the common acceptation of the terms in the community to which they were addressing their laws, which it became them to recognize, and to which their law should be applicable. We find this clause on which the counsel rely, in the act of 1861, first a clause which prescribes the duty upon silk ribbons, galloons, braids, fringes, laces, tassels, buttons, button cloths, etc. Now if I were called upon to construe the words of that section, I should be compelled to say to you, so far as laces are concerned, just what

I have been compelled to say to you in regard to this section of the act of 1864, under which the duty was exacted, that it is comprehensive, that on its face and in the absence of any consideration affecting its construction, it embraces all laces made of silk, just as I have said of the act of 1864. And whereas the duty upon the laces described in section sixteen is fixed at thirty per cent. ad valorem, we find that the duty upon thread laces and insertings, is made by section twenty of that act, twenty per cent. ad valorem. So that it is entirely plain, gentlemen, that when this act was passed, for some reason, and in view of some supposed facts at least, congress attempted to and did discriminate between those goods which they intended to describe by the term "silk laces," and the goods named in the twentieth section, under the designation of thread laces and insertings. Now the counsel for the plaintiff rely upon that designation, and apply the act of 1864 in this way: They say that section eight, which I have just read to you, although broad and comprehensive in its terms, and although its terms are apt to include all these goods, all laces made of silk, yet, inasmuch as those same terms, or substantially the same terms, were included by the act of 1861, and as congress declared a discriminating duty in favor of thread laces, and added to the act of 1864 "that the duties upon all goods, wares, and merchandise imported from foreign countries, not provided for by this act, shall remain as they are," that congress meant that the duty on thread laces should remain unaltered. Now, gentlemen, under that claim two questions arise. First, what were in the act of 1861, called thread laces? Were they these goods that are now in question? I say this in relation to that question; that specific names when used in tariff acts are to be understood according to their general use in trade and commerce, and among those who import by and deal in those articles. According to that understanding, gentlemen, what were the articles that were distinguished in the act of 1861 from silk laces, and were they the articles which are here produced, and upon which the government in this instance exacted sixty per cent.? On behalf of the defendant it is claimed here that the proof requires you to find what the thread laces mentioned in the act of 1861 were thread laces literally so-called, that they were laces made of thread as distinguished from laces made of silk; and that thread is linen. I don't know that I gave the illustration which lies in the line of this suggestion, that no dealer, no customer desiring silk ever asked for thread, and that the term thread is to be taken according to its acceptation throughout the community among merchants, to mean linen as distinguished from silk, thread not silk; and that thread laces here mean thread, being as is claimed just as much thread and distinguished from silk, as silk is appropriately "silk" in distinction from thread. It is claimed on the part of the defendant that this view of the meaning thread lace is corroborated by the testimony of witnesses. In regard to which there is, as you will recollect, more or less tending to support that claim, namely: That thread laces not only means the "thread laces" as described in my last suggestion, but that it is itself a specific term, and that the goods now in question are not known in the market as thread laces, but for the very purpose of discrimination, and for distinguishing and designating these goods otherwise known, as some of the witnesses say, as Chantilly laces. For the purpose of distinguishing these goods, the witnesses call them "black thread laces." It is claimed on the part of the defendant that the evidence tends to show that what was known as thread laces—thread laces simply and singly—under the act of 1861, was lace made of thread; but when these goods were introduced into the market, they came by their appropriate and definite signification of "black thread laces," and fall therefore within the same designation as Pointe d'Alencon lace, Brussels lace, and guipure lace which are made of silk. If that be so, then the duty was rightly imposed upon them as silk laces at sixty per cent.

If the proper name of these goods in trade and commerce was, when this act of 1861 was passed, "black thread lace" to distinguish it from the article known in trade and commerce, bought and sold as "thread lace," then I say that the duty was rightly imposed upon it as silk lace at sixty per cent., and the defendant is entitled to your verdict. On the other hand, if the goods now in question were generally known and designated in trade and commerce by this specific name of thread lace, without anything more, and were distinguished by that from other laces made of silk, it is to be assumed for the purposes of this trial at least, that congress meant to adopt that denomination; and if these goods were thus designated so as not to be included in the term "silk laces" in the act of 1861, then they are not included in the term "silk laces" in the act of 1864, and the plaintiffs are entitled to a verdict. These two propositions, gentlemen, seem to me to embrace the very point and gist of the controversy between these parties.

I have not gone in detail into the various and minute special requests of the counsel for the defendant. I cannot spend time over them. I might lay down perhaps nearly all the various propositions, which are general, by saying on this subject that congress addresses its legislation on the tariff to the understanding of men engaged in the business to which the tariff laws relate; they use terms in the sense in which those parties employ them, save always that when they use general terms that are comprehensive, and embrace all the articles re-

ferred to; you do not gain by dividing them into distinct and separate designation; they still belong to the same class, come under the same definition, and are liable to the same rates of duty. There are several other propositions which perhaps I have not touched upon, but which I will dwell more upon if counsel think it important. I have been called upon to say that, as the counsel for the plaintiffs insist, if these goods are not commonly known as silk laces, then they are not liable to pay duty at the rate of sixty per cent. In that particular proposition I cannot fully concur. The term silk laces does not include them, and they are liable to pay the duty which was exacted, unless they have acquired another name which distinguishes them from silk laces in general, and which has been sanctioned by the discrimination made in the previous tariff laws, or unless the term "silk laces" itself had, prior to this legislation, obtained by general use among commercial men, and in trade and commerce, a specific and discriminative restricted meaning which excludes these laces. Now on that subject the witnesses with considerable uniformity say that the term silk lace is general, and does not describe any particular kind of lace made of silk; their testimony in that respect, confirming what I have said to you is the construction of the act, and the meaning of the term, standing by itself and unaffected by other considerations. Some of them stated that it has no peculiar meaning in trade and commerce. One or more said, if I understand them correctly, substantially, that it is not a term used in asking for any particular kind of laces, and one (I don't profess to give the precise words, and you will correct me in these matters, if I don't state them with entire accuracy), if a customer were to ask for silk lace he should conclude that he didn't know much about laces. Now, testimony of this description tends to show that the term silk laces employed by the government is not a term of technical or commercial signification at all, but that it is used as I have said it must be regarded, except so far as it may be affected by the considerations to which I have alluded, as embracing laces made of silk.

Now, gentlemen, you will apply to this case the instructions which I have given; and without my repeating the testimony or commenting upon it. The discrepancy in the language of the witnesses is not very great, and I apprehend that you will have no difficulty in reaching a result. If the plaintiffs are entitled to recover, there is no dispute about the amount.